UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

MACK SIMS,

     Plaintiff,

     v.                                     Case No. 3:19-CV-1168 JD

CITY OF ELKHART, et al.,

     Defendants.

## OPINION AND ORDER

Plaintiff Mack Sims sued Defendants City of Elkhart, John Faigh, and Charles Wicks after being exonerated and released from a lengthy prison sentence for attempted murder. Mr. Wicks, the prosecutor who handled Mr. Sims's case, died after Mr. Sims filed his lawsuit, and Mr. Sims has now asked the Court to substitute Mr. Wicks's personal representative into the case so that his claims against Mr. Wicks can stay alive. (DE 47; DE 53.) Mr. Wicks[1] opposes Mr. Sims's request, arguing that substitution would be improper given the nature of the claims Mr. Sims brought against him. (DE 51.) For the following reasons, the Court denies Mr. Sims's motion to substitute and finds Mr. Wicks should be dismissed from the case.

### A.    Factual Background

The factual background as alleged in Mr. Sims's complaint is not a point of contention for purposes of this substitution motion, so the Court, like both parties (DE 47 at 1–2; DE 51), refers to the facts as they are detailed in the filed complaint. The events that led to this case

---

[1] The Court recognizes Mr. Wicks has passed away, but for ease of reference it will still use "Mr. Wicks" when referencing the arguments made on his behalf by his counsel and, to the extent she has taken any position through the briefing before this Court, Mr. Wicks's personal representative Penny Wicks.

began in November 1993 when police responded to a reported shooting of a security guard in Elkhart. (DE 1 ¶¶ 8–10.) When officers arrived at the scene, they noticed Mr. Sims near where the security guard had been shot and concluded Mr. Sims was likely involved in the shooting. Mr. Sims did not have anything to do with the shooing, but he remained a suspect as the shooting investigation progressed. (*Id.* ¶¶ 10–14.)

In the ensuing months, Mr. Wicks, the prosecutor responsible for the shooting case, allegedly used his investigative role to frame Mr. Sims as the shooter. Mr. Sims specifically alleges that Mr. Wicks conducted several unduly suggestive lineup procedures during which the security guard who had been shot identified Mr. Sims as the shooter. (*Id.* ¶¶ 25–30.) One such lineup occurred after Mr. Wicks allegedly had the security guard hypnotized in a way that made the security guard focus on Mr. Sims as the perpetrator. (*Id.* ¶¶ 28–30.) Mr. Wicks is alleged to have never shared information about the hypnotism session with Mr. Sims's defense counsel and was later discovered to have actively attempted to hide the fact that the hypnotism had taken place at all. (*Id.* ¶¶ 33–36.)

A jury ultimately convicted Mr. Sims of attempted murder largely because of the security guard's repeated identification of Mr. Sims as the shooter. Mr. Sims received a 35-year sentence as a result of the conviction. (*Id.* ¶ 34.) After several post-conviction motions filed during his many years in prison, Mr. Sims convinced the Seventh Circuit to overturn his conviction in February 2019. (*Id.* ¶¶ 37–41.) Elkhart County followed up on the Seventh Circuit's decision by dismissing all charges against Mr. Sims in April 2019.

Following his exoneration and release, Mr. Sims brought this lawsuit against Elkhart and the individuals he deemed responsible for his wrongful conviction, including Mr. Wicks. Mr. Sims specifically brought three claims against Mr. Wicks pursuant to 42 U.S.C. § 1983, one

claim for violation of the right to a fair trial, one claim for unlawful detention, and one claim for malicious prosecution. (DE 1 ¶¶ 42–52.) Mr. Wicks initially appeared in this case to defend against the claims, but he subsequently died while the case was pending. Mr. Sims now seeks to have Mr. Wicks's personal representative, Penny Wicks, substituted into the case in place of Mr. Wicks to keep the claims against Mr. Wicks alive. (DE 47.)

**B.      Standard of Review**

"Federal Rule of Civil Procedure 25(a) addresses substitution of party upon death." *Herrera v. BP Global Special Prods. (Am.), Inc.*, 2016 WL 183553, at *1 (N.D. Ind. Jan. 14, 2016). Rule 25(a) states in relevant part:

> If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.

Fed. R. Civ. P. 25(a)(1). There is no dispute that Mr. Sims's motion to substitute came within 90 days after service of the statement of death (DE 41; DE 47) or that Penny Wicks would be the proper party for substitution. (DE 51; DE 53 at 1.) The only substitution-related question in dispute is whether the relevant claims against Mr. Wicks abated upon his death.

The Court additionally notes that Mr. Wicks, in asking that he be dismissed from the case, invoked the dismissal standard under Federal Rule of Civil Procedure 12(b)(6) in his response. Mr. Sims objected to application of that standard at this stage of the proceedings given that Mr. Wicks filed his answer to the complaint more than a year and a half before asking to be dismissed. (DE 51 at 2; DE 53 at 2.) While the Court notes Mr. Sims's objection to consideration of dismissal under Rule 12(b)(6) and recognizes that Mr. Wicks's dismissal request comes long after a Rule 12(b)(6) motion can generally be made, *see Hadeen Int'l, LLC v. Zing Toys, Inc.*,

811 F.3d 904, 905 (7th Cir. 2016) (explaining that Rule 12(b) requires a defendant to assert defenses before pleading), the Court cannot find that Mr. Sims could escape having the claims against Mr. Wicks dismissed were the Court to agree with Mr. Wicks that the claims abated when Mr. Wicks died. *See* Rule 25(a); *Sharif v. Funk*, 2020 WL 3545617, at \*9 (N.D. Ill. June 30, 2020) (ordering dismissal of extinguished claims under Rule 25(a)); *Valley Forge Ins. Co. v. Hartford Iron & Metal, Inc.*, 2019 WL 5597558, at \*16 (N.D. Ind. Oct. 30, 2019) (recognizing that a court can construe a motion as one under Rule 12(c) and in that way apply the same Rule 12(b)(6) standard to dismiss a claim even after an answer has been filed). Therefore, if the Court finds the claims against Mr. Wicks abated, it will dismiss Mr. Wicks from the case, just not pursuant to Rule 12(b)(6).

## C.  Discussion

The parties' main focus in their briefing was on whether the three claims Mr. Sims lodged against Mr. Wicks abated when Mr. Wicks died. The Court will address the parties' dispute on that question, but before doing so, it must first address two more peripheral arguments Mr. Wicks raised in an attempt to escape the three claims: that Mr. Sims's unlawful detention claim was not timely filed and that the three claims against Mr. Wicks are barred by sovereign immunity. (DE 51 at 9–10.)

### 1.  *Timeliness and capacity disputes*

The Court finds that Mr. Sims filed his unlawful detention claim on time. The parties both agreed that the applicable statute of limitations period for Mr. Sims's unlawful detention claim is the two-year period that applies to Indiana tort actions. *See* (DE 51 at 9; DE 53 at 7); Ind. Code § 34-11-2-4; *Wallace v. Kato*, 549 U.S. 384 (2007). But they disagreed about whether

that time period began to run at the end of Mr. Sims's pretrial detention on August 24, 1994, or

when Mr. Sims was exonerated and released from prison in 2019. (DE 51 at 9; DE 53 at 7.) A §

1983 claim for unlawful pretrial detention accrues when the would-be plaintiff is released from

custody, because § 1983 "cannot be used to contest ongoing custody that has been properly

authorized." *Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018) (citing *Heck v.

Humphrey*, 512 U.S. 477 (1994); *Preiser v. Rodriguez*, 411 U.S. 475 (1973)). Here, there is no

dispute that Mr. Sims was exonerated and released from prison in 2019. (DE 47 at 2; DE 51 at

1.) His unlawful detention claim thus accrued in 2019, *see Manuel*, 903 F.3d at 670, which

means he was still well within the applicable two-year limitations period when he filed his

unlawful detention claim as part of his complaint in December 2019, (DE 1 ¶¶ 47–49). *See

Jordan v. City of Chicago*, 2021 WL 1962385, at * 3–4 (N.D. Ill. May 17, 2021) (denying

motion to dismiss pre-trial detention claim because it would have been *Heck*-barred until

dismissal of charges).

The Court next turns to Mr. Wicks's sovereign immunity argument, which is based on his

assertion that Mr. Sims brought all three § 1983 claims against him in his official capacity. (DE

51 at 10.)[2] When, as here, a complaint does not explicitly state the capacity in which a defendant

is being sued, the Court looks to the nature of the claims brought and relief sought in the

complaint to draw a conclusion. *See Miller v. Smith*, 220 F.3d 491, 494 (7th Cir. 2000); *Hill v.

Shelander*, 924 F.2d 1370, 1373–74 (7th Cir. 1991). "Where the plaintiff seeks injunctive relief

from official policies and customs, the defendant has been sued in [his] official capacity; where

the plaintiff alleges tortious conduct of an individual acting under color of state law, the

---

[2] The Court notes that Mr. Wicks waited more than a year and a half to raise this sovereign immunity argument instead of raising it in a motion to dismiss after Mr. Sims filed his complaint.

defendant has been sued in [his] individual capacity." *Miller*, 220 F.3d at 494 (citing *Hill*, 924 F.2d at 1373–74).

The substance of Mr. Sims's complaint suggests that Mr. Sims brought the three § 1983 claims against Mr. Wicks in Mr. Wicks's individual capacity, not his official capacity. For example, the complaint alleges that Mr. Wicks engaged in tortious conduct (DE 1 ¶¶ 25–41) in his capacity as an Elkhart County prosecutor acting under color of law (*id.* ¶ 6). As the court in *Miller* recognized, allegations of that nature suggest claims being brought against someone in his individual capacity. 220 F.3d at 494. Additionally, Mr. Sims did not seek injunctive relief, the type of relief that would typically indicate claims brought against someone in his official capacity, but instead sought monetary relief (DE 1 at 11–12), which is indicative of claims brought against a defendant in his individual capacity. *See Miller*, 220 F.3d at 494; *Hill*, 924 F.2d at 1374 (recognizing injunctive relief "against a state official may be recovered only in an official capacity suit" and monetary relief may be recovered against a government actor only in an individual capacity suit). Finally, although Mr. Wicks seems to suggest otherwise (DE 51 at 10), the fact that Mr. Sims referred to Mr. Wicks's official position as a deputy prosecutor within the complaint is still consistent with individual capacity claims and does not transform the claims into official capacity claims. *See Bassett v. Chicago State University*, 2008 WL 3849920, at *2–3 (N.D. Ill. Aug. 15, 2008). Given these indications within the complaint that the claims were brought against Mr. Wicks in Mr. Wicks's individual capacity, the Court finds Mr. Wicks's sovereign immunity argument unavailing.

### 2. *Survival of the § 1983 claims*

Having resolved those two preliminary issues, the Court proceeds to the central dispute between the parties about whether Mr. Wicks's death extinguished the claims Mr. Sims brought

against him. The dispute comes down to a disagreement between the parties about whether Mr. Sims's § 1983 claims need to be individually analogized to state torts to determine survivability or whether all three § 1983 claims should simply be considered generalized state personal injury claims for purposes of the survival analysis. Mr. Sims argues that the claims can remain active against Mr. Wicks's personal representative because Seventh Circuit and Supreme Court caselaw directs the Court to treat all § 1983 claims, no matter their content, as if they were generalized state personal injury torts when determining survivability. (DE 53 at 2–4.) Mr. Wicks argues that the claims have abated because Seventh Circuit caselaw requires the Court to analogize each § 1983 claim to the most similar Indiana tort claim and then use that similar state-law tort to determine survivability. (DE 51 at 3–9.) The disagreement matters here because Indiana's survival statute generally allows personal injury claims to survive, but it does prevent certain personal injury torts, some of which resemble Mr. Sims's § 1983 claims, from surviving. *See* Ind. Code § 34-9-3-1. The Court first explains why Mr. Wicks is correct to suggest that analogizing each § 1983 claim is the proper course and then explains why that analogizing ultimately requires the Court to find the claims against Mr. Wicks have abated.

### a.    The basis for analogizing

The Court begins its explanation for analogizing by looking at how courts have analyzed § 1983 statute of limitations issues over time. While there are no statute of limitations issues at play here, exploring the history of § 1983 statute of limitations analyses helps to explain Mr. Sims's position on how the Court should analyze § 1983 survivability. Because § 1983 did not specify a statute of limitations, courts, pursuant to 42 U.S.C. § 1988, at first would analogize the specific § 1983 claim they were considering to the most similar state claim they could find and then use the statute of limitations that applied to the state claim as the statute of limitations for

the § 1983 claim. *See* 42 U.S.C. § 1988; *Wilson v. Garcia*, 471 U.S. 261, 264–66, 271–75 (1985); *see also Robertson v. Wegmann*, 436 U.S. 584, 589 (1978); *Bennett v. Tucker*, 827 F.2d 63, 67 (7th Cir. 1987) (quoting 42 U.S.C. § 1988) (explaining that § 1988 "provides that if federal law does not provide a rule of decision in a civil rights case, federal law will incorporate the appropriate state law, unless that law is 'inconsistent with the Constitution and laws of the United States.'"). But the Supreme Court, in *Wilson*, eventually found that process "imperfect." 471 U.S. at 272. Based largely on reasoning that "a simple, broad characterization of all § 1983 claims best fits the statute's remedial purpose," the Supreme Court instructed courts presented with § 1983-related statute of limitations questions to, moving forward, read § 1988 "as a directive to select, in each [s]tate, the one most appropriate statute of limitations for all § 1983 claims," which, according to the Supreme Court, was "the tort action for the recovery of damages for personal injuries." 471 U.S. at 271–75. The *Wilson* holding, Mr. Sims argues, was the first step toward classifying all § 1983 claims the same way for purposes not just of statute of limitations but also for purposes of survivability. (DE 47 at 3–5.)

The next step, according to Mr. Sims, came when the Seventh Circuit decided *Bennett v. Tucker* several years after *Wilson*. In *Bennett*, the Seventh Circuit had to decide whether the daughter of one of the then-deceased original plaintiffs could be substituted in for her mother for purposes of an appeal on § 1983 claims. 827 F.2d at 67. Because § 1983 was "silent on the question of survivability," just like it was on the question of statutes of limitations for § 1983 claims, the Seventh Circuit, relying on § 1988, looked to state law. *Id.* The *Bennett* panel invoked the *Wilson* decision in recognizing that the Supreme Court had "stressed the importance of adopting uniform rules governing the timeliness of all § 1983 claims" and the "appropriateness of analogizing a § 1983 claim to a personal injury claim." *Id.* at 68. It then held

that "it would be anomalous to use a different analogy" in the survivability context and concluded that "in order to determine whether a § 1983 claim survives, [a court] must look to the state law governing whether a personal injury claim survives." *Id.* This decision in *Bennett* is the source of the dispute between Mr. Sims and Mr. Wicks on the pending substitution motion. Mr. Sims argues that *Bennett*, with its recognition that the Supreme Court had "stressed the importance of adopting uniform rules governing the timeliness of all § 1983 claims," supports his position that *Bennett* requires ongoing parity between how courts treat § 1983 statute of limitations analyses and § 1983 survivability analyses. (DE 47 at 6–8, 10–11) (citing *Bennett*, 827 F.2d at 68; *Wilson*, 471 U.S. 261). Mr. Wicks argues that *Bennett* simply required courts within the Circuit, moving forward, to use the state law governing whether a personal injury claim survives and nothing more. (DE 51 at 4.)

Mr. Sims's argument for parity ultimately leads him to the position asserted in his briefing that all § 1983 claims should be treated as generalized state personal injury torts for purposes of survivability, because that is how the Supreme Court and Seventh Circuit treat § 1983 claims when resolving statute of limitations issues. (DE 47 at 12–13; DE 53 at 4–5.) The important holding for Mr. Sims's argument is the Supreme Court's decision in *Owens v. Okure*, which dealt solely with § 1983 statute of limitations concerns and came two years after the Seventh Circuit decided *Bennett*. 488 U.S. 235 (1989). The Supreme Court in *Owens* aimed to remedy some uncertainty that its earlier *Wilson* holding had created. Although courts understood that *Wilson* required them to pick and apply one state personal injury statute when determining the statute of limitations for § 1983 claims, they were still often left on their own to choose whether they should comply with *Wilson* by picking the state's limitations period for intentional torts or the state's residual limitations period for other personal injuries. *See Owens*, 488 U.S. at

9

236. *Owens* addressed that confusion by clarifying that "where state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions." *Id.* at 249–50.

The Seventh Circuit has clearly followed *Owens* in recognizing that, for § 1983 statute of limitations questions, all § 1983 claims are to be treated as generalized personal injury torts no matter the specific injuries the claims are asserting. *See Woods v. Illinois Dep't of Child. & Fam. Servs.*, 710 F.3d 762, 766 (7th Cir. 2013) ("In line with *Wilson* and *Owens*, this court has consistently held that the limitations period applicable to § 1983 actions brought in Illinois is the two-year period for general personal injury actions."). According to Mr. Sims, the Seventh Circuit's recognition in *Woods* that all § 1983 claims must be treated as generalized personal injury claims for purposes of statute of limitations analyses, coupled with the Seventh Circuit's emphasis in *Bennett* on parity between § 1983 statute of limitations considerations and § 1983 survivability considerations, indicates that the Seventh Circuit should treat all § 1983 claims as generalized personal injury claims for survivability purposes as well. (DE 47 at 12–13; DE 53 at 4–6.)

Mr. Sims's argument has support from two recent Sixth Circuit decisions, both of which applied similar reasoning to what Mr. Sims has put forward in deciding to treat all § 1983 claims as generalized personal injury claims when determining survivability. *See Jackson v. City of Cleveland*, 925 F.3d 793, 809–12 (6th Cir. 2019) (citing *Crabbs v. Scott*, 880 F.3d 292, 294–95 (6th Cir. 2018). The Sixth Circuit has held that, for purposes of survivability, "the appropriate level at which to generalize a § 1983 claim under state law is as a personal injury action, sounding in tort, and nothing further." *Crabbs*, 880 F.3d at 296; *see also Jackson*, 925 F.3d at 811 (confirming that *Crabbs* stands for the proposition that "all § 1983 claims must be treated

the same way for survival-of-claims purposes, just as they are for statute-of-limitations purposes"). Further, like Mr. Sims, the panel in *Crabbs* read the Seventh Circuit's holding in *Bennett* as indicating the Seventh Circuit agrees with that interpretation. *Crabbs*, 880 F.3d at 295 (quoting *Bennett*, 827 F.2d at 67–68) ("In reaching this conclusion, we agree with the Seventh Circuit. It held that characterizing all § 1983 claims as personal injury actions was 'equally important' in the survivorship context and that it would be 'anomalous' to draw a distinction between survivorship statutes and statutes of limitation.").

But while the Court recognizes that Mr. Sims and the Sixth Circuit read *Wilson*, *Bennett*, and *Owens* to suggest the Seventh Circuit either does or should treat all § 1983 claims as generic personal injury claims when determining survivability, the Court will not join them in doing so. The Court finds no evidence that the Seventh Circuit has actually taken the step of treating all § 1983 claims as generic personal injury torts when faced with survivability disputes in the years after *Wilson*, *Bennett*, and *Owens*. Instead, the Seventh Circuit has chosen to hew to Mr. Wicks's position and recognized the need to analogize § 1983 claims to state personal injury claims when the applicable state statute and nature of the § 1983 claims being presented make analogizing necessary to properly apply the state statute.

The strongest indication that the Seventh Circuit has opted for Mr. Wicks's analogizing approach instead of Mr. Sims's generalizing approach is the Seventh Circuit's holding in *Bentz v. City of Kendallville*, 577 F.3d 776 (7th Cir. 2009). In that case, the appellant died during the course of an appeal and the Seventh Circuit panel had to decide whether the § 1983 claims the deceased appellant had raised before the district court and on appeal could survive after his death. *Id.* at 778. Because of § 1983's silence on the issue of survival, the panel looked "to the most closely analogous state law to determine survivability." *Id.* at 778 (citing 42 U.S.C. § 1988;

*Bass ex re. Lewis v. Wallenstein*, 769 F.2d 1173, 1188 (7th Cir. 1985); *Robertson*, 436 U.S. at 588–91; *Anderson v. Romero*, 42 F.3d 1121, 1123 (7th Cir. 1994)). The case had its roots in Indiana, so the panel chose Indiana's state statute on survival of personal injury claims, Indiana Code § 34-9-3-1, as the relevant statute to consider and held that the statute was not inconsistent with federal law. *Id.* at 778–79. The panel then explained that "[i]n order to apply Indiana law, we must properly analogize [the appellant's] § 1983 claims to the appropriate Indiana torts." *Id.* at 779. The analogizing, according to the panel, required it to "characterize [the § 1983] claim" and then decide "which Indiana tort is the most similar without molding the constitutional claim to fit within the contours of state law." *Id.* (citing *Bass*, 769 F.2d at 1188). As a last step, the panel "turn[ed] to the Indiana survival statute to determine whether [the § 1983] claim should survive." *Id.* In finding these steps proper when confronted with a § 1983 survivability dispute, the panel, years after *Wilson*, *Bennett*, and *Owens* were decided, clearly chose Mr. Wicks's analogizing approach over Mr. Sims's generalizing approach.

Subsequent courts within the Circuit that have considered whether § 1983 claims survive under Indiana law have also applied *Bentz*'s analogizing approach. In *Camm v. Clemons*, a Southern District of Indiana court considered whether a plaintiff's § 1983 claims for wrongful arrest and detention and suppression of evidence survived the plaintiff's death. 544 F. Supp. 3d 847, 852–53 (S.D. Ind. 2021). The court, relying on *Bentz* and *Bennett*, analogized the § 1983 claim for wrongful arrest and detention to the Indiana tort of false imprisonment and the § 1983 claim for evidence suppression to the Indiana tort of malicious prosecution. *Id.* at 855–56. It then looked to Indiana Code § 34-9-3-1, saw that the statute did not allow the state torts of false imprisonment and malicious prosecution to survive a party's death, and dismissed the § 1983 claims on that basis. *Id.* at 856–59. In *Donald v. Outlaw*, a court within this District did much the

same thing after a party had died. The court relied on *Bentz* in selecting Indiana Code § 34-9-3-1 as the applicable state statute and then analogized the two § 1983 claims at issue, which alleged detention and prosecution without probable cause, to the Indiana torts of malicious prosecution and false imprisonment. 2018 WL 2463605, at *3 (N.D. Ind. May 31, 2018). The *Donald* court, like the *Camm* and *Bentz* courts, lastly relied on the Indiana survival statute in holding that because the analogous state claims would abate under the statute after the death of a party, the § 1983 claims must be found to have abated too. *Id.*

Further, the Court finds that these decisions are not inconsistent with *Bennett* or the Seventh Circuit's decisions in § 1983 claim survivability cases decided in the period between *Bennett* and *Bentz*. The holding in *Bennett*, as Mr. Wicks noted in his response brief, never stated that all § 1983 claims need to be treated as *generalized* personal injury claims for purposes of survivability analyses. (DE 51 at 4.) *Bennett* instead only required courts to "look to the state law governing whether a personal injury claim survives." 827 F.2d at 68. Thus, while § 1983 claims clearly had to be treated as state personal injury claims during survivability analyses after *Bennett*, *Bennett* left open the question of what kind of personal injury claim the § 1983 claims should be. That question became particularly important when the state statute being considered allowed some personal injury claims to survive but required other personal injury claims that resembled the § 1983 claims being alleged to abate. *See Bentz*, 577 F.3d at 778–79 (recognizing that it had to "properly analogize" the claims "to the appropriate Indiana torts" "[i]n order to apply Indiana law"). *Bennett* never had to address that question because the § 1983 claims it was considering alleged due process failures and the only personal injury actions the applicable Illinois survival statute forced to abate upon a party's death were the dissimilar actions for

slander or libel. *See* 827 F.2d at 68; 755 Ill. Comp. Stat. 5/27-6. While *Bennett* did not address those exceptions under the Illinois statute though, future Seventh Circuit panels would.

The Seventh Circuit, in the 1994 *Anderson v. Romero* case, allowed the § 1983 claims it was considering to survive under the same Illinois survival statute applied in *Bennett*, but in doing so chose to clearly distinguish the § 1983 claims being alleged from the state claims the statute prevented from surviving. *Anderson*, 42 F.3d 1121. In describing the relevant *Bennett* precedent, Judge Posner, writing for the *Anderson* panel years after *Wilson*, *Bennett*, and *Owens* had been decided, explained that the Seventh Circuit "held in *Bennett v. Tucker*[] that Illinois's rule for personal injury suits—the rule that such suits survive the plaintiff's death unless they are suits for defamation[]—was appropriate for suits under section 1983, which the Supreme Court had analogized to personal injury actions for purposes of choosing the statute of limitations." *Anderson*, 42 F.3d at 1123 (citing *Wilson*, 471 U.S. 261). The explicit mention of the exception under Illinois law for defamation-related claims was particularly important in *Anderson*, because the defendants had specifically argued that the plaintiff's § 1983 claims, which had alleged cruel and unusual punishment and other constitutional violations, *id.* at 1122, were similar enough to defamation that they should be found to have abated upon the plaintiff's death. *Id.* at 1123–24.

If the panel had been aligned with Mr. Sims's view that, after *Wilson*, *Bennett,* and *Owens*, all § 1983 claims were treated the same for purposes of a survivability analysis, it could have simply held that the defendants' attempt to link the plaintiff's federal claims to the specifically excluded claims under the Illinois statute was useless because all § 1983 claims would be treated as generalized personal injury claims. But the Seventh Circuit did not do that. Instead, the Seventh Circuit still rejected the defendants' argument, but it did so by distinguishing the § 1983 claims from the personal injury torts that the Illinois statute kept from

14

surviving. *Id.* (concluding that while "[i]t is true that under Illinois law, as generally, defamation suits do not survive the plaintiff's death," the plaintiff's "complaint does not allege defamation or anything like it"). The fact that the panel felt it necessary to explain that the plaintiff's § 1983 claims could not be analogized to defamation, a personal injury claim excepted under the applicable Illinois survival statute, shows the Seventh Circuit's recognition that, even after *Owens*, analogizing when state survival statutes exclude certain claims can be necessary.

The Court also notes that the *Anderson* panel's acknowledgement of the defamation-related personal injury claims that would abate under the relevant Illinois statute was not an aberration. Those excepted personal injury claims were regularly mentioned in succeeding years as courts within the Circuit considered § 1983 survivability disputes that originated in Illinois. *See Malone v. Nielson*, 474 F.3d 934, 937, n.3 (7th Cir. 2007) (citing 755 Ill. Comp. Stat. 5/27-6; *Anderson*, 42 F.3d 1123) (recognizing that "[i]n Illinois, personal injury suits survive the plaintiff's death and inure to the benefit of the plaintiff's estate" with "the only exception to this rule [being] a claim for defamation"); *see also Wood v. Chicago Bd. of Educ.*, 1998 WL 832656, at *5 (N.D. Ill. Nov. 20, 1998) (recognizing that Illinois's survival statute allows a plaintiff's personal injury claim to survive unless it is a defamation claim); *Reddick v. Bloomingdale Police Officers*, 1997 WL 441328, at *4 (N.D. Ill. July 30, 1997) (same).

The recognized need in *Anderson* to analogize when the relevant state statute does not allow all personal injury claims to survive the death of a party further fits with the courts' decisions in *Bentz*, *Camm*, and *Donald*. Like Illinois's survival statute, Indiana's survival statute excludes causes of action for libel and slander. But Indiana's statute goes further to also prevent causes of action for malicious prosecution, false imprisonment, invasion of privacy, and personal injuries to the deceased party from surviving a party's death. Ind. Code § 34-9-3-1. The Indiana

statute also considers all of those excluded causes of actions claims for "personal injuries," which means that even if a court recognizes, as Mr. Sims noted multiple times in his briefing (DE 47 at 7–8; DE 53 at 3–4), that *Bennett* requires courts to treat § 1983 claims as "personal injury actions," the court is still left with the post-*Bennett* problem noted above of determining *what kind* of personal injury action each § 1983 claim entails.[3] *See Merimee v. Brumfield*, 397 N.E.2d 315, 318 (Ind. Ct. App. 1979) ("the words 'personal injuries,' in the context of the survival statute, include within their meaning, in addition to injuries to the physical body, malicious prosecution, false imprisonment, libel, slander, or any affront or detriment to the body, psyche, reputation or liberty, as contradistinguished from injury to property rights"). The decisions in *Bentz*, *Anderson*, *Camm*, and *Donald* all suggest that the Seventh Circuit makes that determination not by treating all § 1983 claims as generalized personal injury claims but instead by analogizing the specific § 1983 claims being alleged to specific state torts. *See Bentz*, 577 F.3d at 78–79; *Anderson*, 42 F.3d at 1123; *Camm*, 544 F. Supp. 3d at 852–53; *Donald*, 2018 WL 2463605 at *3.

As a final note, the Seventh Circuit is not alone in recognizing that analogizing is a proper way to decide whether § 1983 claims survive the death of a party. While Mr. Sims wants the Court to import *Owens*'s conception of § 1983 claims as generalized personal injury torts for statute of limitations questions into survivability analyses, the Court notes that the Supreme Court has not adopted *Owens*'s reasoning in that way itself. *Owens* did not address survivability issues and did not modify the Supreme Court's prior holding in *Robertson*, which did address §

---

[3] The Court notes that this issue and subsequent need to analogize does not always arise. For example, when the Seventh Circuit analyzed a § 1983 survivability issue that arose in Wisconsin, no analogies or comparisons were necessary because Wisconsin's statute governing survival of personal injury claims allowed all personal injury claims to survive. *See Hutchinson v. Spink*, 126 F.3d 895 (7th Cir. 1997) (quoting Wis. Stat. § 865.02(1)(b)) (recognizing that "[i]n Wisconsin a tort action for 'injuries to person' survives the victim's death").

1983 survivability, remains good law, and allowed for the possibility that courts would analogize individual § 1983 claims to state torts to determine whether the § 1983 claims could survive the death of a party. *See* 436 U.S. at 590–92, 593 n.11 (holding there is "nothing in [§ 1983] or its underlying policies to indicate that a state law causing abatement of a particular action should invariably be ignored in favor of a rule of absolute survivorship" and that the "statutory reliance on state law obviously means that there will not be nationwide uniformity on these issues"). In a similar vein, other circuits have relied on *Robertson* in finding that analogizing for purposes of § 1983 survivability disputes is the proper way to resolve such disputes. *See Brown v. Town of Cary*, 706 F.3d 294, 300 (4th Cir. 2013) ("Analogizing [the plaintiff's] federal civil rights claim to a corresponding action under North Carolina law, we are satisfied that the claim would survive under that statute."); *Est. of Gilliam ex rel. Waldrop v. City of Prattville*, 639 F.3d 1041, 1046–47 (11th Cir. 2011); *Caine v. Hardy*, 943 F.2d 1406, 1410 (5th Cir. 1991); *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (holding that a § 1983 malicious prosecution claim could be analogized to Oklahoma's malicious prosecution claim and thus would not survive); *Parkerson v. Carrouth*, 782 F.2d 1449, 1451–53 (8th Cir. 1986) (affirming a district court's application of Arkansas's survivorship statute and analogizing of a § 1983 malicious prosecution claim to a state malicious prosecution claim).

The Court thus finds that there is ample support, both within the Seventh Circuit and elsewhere, for its choice to turn to analogizing while resolving the pending motion for substitution. Having reached that conclusion about the proper method of analysis, the Court moves to consider whether the three claims Mr. Sims brought against Mr. Wicks survived Mr. Wicks's death.

> b.     *Analogizing the claims and determining survivability*

There is no dispute that the relevant state statute for the Court to consider and apply, based on the directive in *Bennett*, is Indiana Code § 34-9-3-1. (DE 47 at 6–7; DE 51 at 3); *see* 42 U.S.C. § 1988; *Bentz*, 577 at 778–79. And, based on the fact that the Indiana statute precludes certain state personal injury claims from surviving, the Court finds it will be necessary to analogize the three § 1983 claims Mr. Sims's brought against Mr. Wicks to Indiana personal injury claims. The Court will first analogize each § 1983 claim to a relevant state claim and then, using its analogies, determine whether the § 1983 claims would survive under Indiana's statute. *See Bentz*, 577 F.3d at 778–79.

Mr. Sims's § 1983 malicious prosecution claim is most analogous to the Indiana state tort of malicious prosecution. While that may seem somewhat obvious given the two claims share the same name, the Court nonetheless compares the claims' elements and Mr. Sims' allegations to justify its conclusion. In asserting his claim, Mr. Sims alleged that Mr. Wicks acted willfully, wantonly, and maliciously in causing him to be detained, prosecuted, and imprisoned "without there being genuine probable cause to believe that [Mr. Sims] had committed a crime." (DE 1 ¶ 51.) To succeed on a § 1983 malicious prosecution claim, a plaintiff must show that: (1) the elements of the state law claim for malicious prosecution have been satisfied; (2) the malicious prosecution was propagated by state actors; and (3) the plaintiff was deprived of liberty. *Welton v. Anderson*, 770 F.3d 670, 674 (7th Cir. 2014). To prove malicious prosecution under Indiana law, the plaintiff must establish that: (1) the defendant instituted or caused to be instituted an action against the plaintiff; (2) the defendant acted maliciously in so doing; (3) the defendant had no probable cause to institute the action; and (4) the original action was terminated in the plaintiff's favor. *Golden Years Homestead, Inc. v. Buckland*, 557 F.3d 457, 462 (7th Cir. 2009).

The overlap and similarity between the federal and state malicious prosecution claims is clear in part because the federal § 1983 malicious prosecution claim Mr. Sims asserted requires as one of its elements that the state-law malicious prosecution tort be established. *See Welton*, 770 F.3d at 674. The analogy between the federal and state claim is additionally supported by the fact that both § 1983 malicious prosecution and Indiana malicious prosecution require a defendant to have acted maliciously and deprived the plaintiff of due process, whether that be by depriving a plaintiff of liberty or by prosecuting him without probable cause. *See Welton*, 770 at 674; *Golden Years*, 557 F.3d at 462. Further, the deprivation of due process that is required to prove both the federal and state claims is central to Mr. Sims's allegations given Mr. Sims supported his claim by alleging he was detained, prosecuted, and imprisoned without probable cause and "in violation of [his] due process rights." (DE 1 ¶ 51.) The Court therefore finds that Mr. Sims's § 1983 malicious prosecution claim is best analogized to an Indiana malicious prosecution claim for purposes of this analysis. *See Donald*, 2018 WL 2463605 at *3 (finding an Indiana malicious prosecution claim to be the best analogy on similar facts).

Next, the Court considers Mr. Sims's § 1983 claim for unlawful detention, which it finds to be most analogous to the Indiana tort of false imprisonment. In support of his unlawful detention claim, Mr. Sims alleged he was "detained without there being any probable cause to believe that [he] had committed a crime." (DE 1 ¶ 48.) Federal unlawful detention generally refers to detention without legal process. *See Wallace v. Kato*, 549 U.S. 384, 389 (2007). The Indiana tort of false imprisonment similarly occurs when there is: (1) unlawful; (2) restraint; (3) upon one's freedom of movement or the deprivation of one's liberty; (4) without consent. *Donovan v. Hoosier Park, LLC*, 84 N.E.3d 1198, 1207 (Ind. Ct. App. 2017). The Court finds that Mr. Sims's unlawful detention claim based on his detention without probable cause involves

allegations that would equally be used to support the kind of unlawful restraint that deprives an individual of his liberty without his consent that underlies a claim for false imprisonment in Indiana. This is particularly apparent given that both federal unlawful detention and Indiana false imprisonment attempt to resolve infringement on an individual's liberty that occurs because of unwarranted detention. *See Wallace*, 549 U.S. at 389; *Donovan*, 84 N.E.3d at 1207. The Court also finds the analogy between federal unlawful detention and Indiana false imprisonment supported by the fact that the *Camm* court drew the same comparison when presented with similar allegations from the plaintiff in that case. 544 F. Supp. 3d at 856 (finding the plaintiff's claim for wrongful pretrial detention because of a lack of probable cause "more closely aligns with the state-law claim of false imprisonment").

Finally, the Court considers Mr. Sims's claim for violation of his right to a fair trial, which the Court finds is most analogous to an Indiana malicious prosecution claim. Mr. Sims supported the claim by alleging that Mr. Wicks "created and/or participated in unduly suggestive identification procedures," "withheld exculpatory and/or impeaching material," and "manufactured false evidence." (DE 1 ¶¶ 43–45.) The Court takes each of those allegations in turn and finds they each resemble conduct that would be addressed through a state malicious prosecution claim.

First, Mr. Sims's allegation of withheld evidence describes a violation of the Fourteenth Amendment as recognized in *Brady v. Maryland*, 373 U.S. 83 (1963). So-called *Brady* violations occur when: (1) the evidence at issue is favorable to the accused; (2) the evidence was suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued. *See Alexander v. F.B.I.*, 2011 WL 4833091, *2 (S.D. Ind. Oct. 12, 2011). The Court finds that Mr. Sims's *Brady* allegations are most similar to claims that

would give rise to the state tort of malicious prosecution, because a claim for *Brady* violations and a state malicious prosecution claim both aim to remedy attempts to undermine the integrity of the legal process in a criminal prosecution and arise from prosecutorial misconduct. *See Camm*, 544 F. Supp. 3d 847 (analogizing *Brady* violations to a claim in Indiana of malicious prosecution).

Second, the Court finds that Mr. Sims's allegations of unduly suggestive photo identification procedures are also best analogized to allegations that would support a state claim for malicious prosecution. As with the *Brady* violations, the suggestive identification procedures being alleged damage the integrity of the judicial process and result from improper investigative techniques. *See United States v. Hawkins*, 499 F.3d 703, 707 (7th Cir. 2007) (holding that an unduly suggestive photo identification claim exists when (1) the identification procedure was unduly suggestive and (2) the totality of the circumstances suggest the identification was unreliable). The Court finds that the principles of protecting the integrity of the legal process implicated by Mr. Sims's allegations about suggestive identification procedures are the same principles at play when considering the purpose of a state claim for malicious prosecution. *See Golden Years*, 557 F.3d at 462.

Third, the Court finds that the manufactured evidence allegations in Mr. Sims's right to a fair trial claim is also analogous to Indiana's malicious prosecution tort. As was true for the allegations tied to the *Brady* violations and improper identification procedures, Mr. Sims's allegations of manufactured evidence suggest a harm he suffered because of actions taken by officials that undermined the judicial process. Further, the Seventh Circuit has, in the past, recognized the similarities between a § 1983 action based on allegations of manufactured evidence and a state claim for malicious prosecution. *See Petty v. City of Chicago*, 754 F.3d 416,

421 (7th Cir. 2014) (drawing parallels between § 1983 allegations of manufacturing evidence and state malicious prosecution claims); *Brooks v. City of Chicago*, 564 F.3d 830, 833 (7th Cir. 2009). For each of those reasons, the Court finds that Mr. Sims's § 1983 claim for denial of a right to a fair trial is best analogized to an Indiana state claim for malicious prosecution.

Having analogized each claim to its most similar state tort as directed in *Bentz*, the Court "turn[s] to the Indiana survival statute to determine whether [each] claim should survive." 577 F.3d at 779. Under Indiana Code §34-9-3-1, a "cause of action survives and may be brought . . . against the representative of the deceased party except actions for . . . (3) malicious prosecution [and] (4) false imprisonment . . . ." Ind. Code § 34-9-3-1(a)(3)–(4). The Court found above that Mr. Sims's claims were most analogous to the Indiana personal injury claims of malicious prosecution and false imprisonment. Because Indiana's survival statute states that false imprisonment and malicious prosecution claims do not survive the death of a party, the Court finds that Mr. Sims's § 1983 claims against Mr. Wicks abated upon Mr. Wicks's death. *See Camm*, 544 F. Supp. 3d at 858 (holding the same); *Donald*, 2018 WL 2463605 at *3 (holding the same). Therefore, the Court finds that substitution of Penny Wicks, Mr. Wicks's personal representative, into this case would be improper and that Mr. Wicks should instead be dismissed from this lawsuit because there are no valid claims remaining against him.

### D.    Conclusion

For the foregoing reasons, the Court DENIES Plaintiff Mack Sims's Motion to Substitute Party (DE 47) and dismisses Defendant Charles Wicks from the case. The Court notes that Mr. Sims's claims in Counts I, II, and III of his complaint remain active against Defendant John Faigh.

SO ORDERED.

ENTERED: August 11, 2022

_____/s/ JON E. DEGUILIO_____
Chief Judge
United States District Court